Court, my name is Alex Benton. I represent Dennis Hutchins. This is an appeal taken from the District Court's denial of qualified immunity. The District Court based its denial of qualified immunity based on its perception of material fact disputes that precluded, that the District Court determined should be determined by a jury more so than a court. Could I ask you please, counsel, I think if you push the button on the side there, you can raise the podium a little. I don't hear all that well, so if you can get the microphone a little closer. And your honor, I can raise my voice as well. I tend to be a little soft spoken, so please excuse me. Thank you. The issues on this appeal are whether or not the factual disputes noted by the District Court are foreclosed by the record of the appeal. Whether Officer Hutchinson's use of deadly force was objectively reasonable, and whether Officer Hutchinson's use of force violated clearly established law. I want to talk about the jurisdictional argument. The appellee did file a motion to dismiss in this matter. It is Hutchinson's claim that the material facts as found by the District Court foreclosed a factual dispute primarily because they established the objective reasonableness of the use of force. And those facts that the District Court noted are, number one, that prior to Officer Hutchinson arriving on the scene, the dispatch notified him that the subject, Roy Richards Jr., was intoxicated, causing a disturbance, and armed with a long gun. Once he arrived, he observed Roy Richards Jr. and Darrell Underwood fighting on the ground in front of Darrell Underwood's porch. The court noted that Hutchinson saw the fight break up, Underwood turned towards his porch, and Roy Richards walked to his car. The court noted that moments later, Hutchinson saw Roy Richards Jr. emerge from the rear driver's side of that door with the long gun, pursuing towards Underwood's house. And at that point, from 80 feet away, he stopped, aimed, and shot Roy Richards Jr. Appellant submits at that moment, Roy Richards Jr. was a threat. So the record, as found in a light most favorable to the appellee, forecloses the material fact disputes that, the court noted, the jury needed to decide. Who would he have been a threat to, and what's the evidence? Because he had turned away from the house at that point, right? At that point, he was pursuing Darrell Underwood into the house. So he emerged from the rear of the driver's side door with a gun in hand. Mr. Underwood sees this, turns, and as he testified, briskly moved towards his house. So Hutchinson, seeing this from 80 feet away, perceived the imminent homicidal act. He perceived, he seen two men fighting, one man go to the car, emerge with a firearm, pursuing another man. At that point, it's objectively reasonable for Hutchinson to perceive that that is a threat, that Roy Richards Jr. is a threat. Sure, but before the shooting, and correct me if I have the facts wrong, Underwood goes into the house, and I guess... Roy Richards Jr. He then turns back away from the house, back toward his vehicle. It's undisputed that during this process, Darrell Underwood did make it inside his house. He was seconds inside his house. Roy Richards Jr. makes it to the top of the steps, and the witness, Charles James, testified that he starts to turn to his left at about 10 o'clock. But he also testified that he could have spun around. He didn't know. Hutchins testified that he thought he spun around when he shot him. Okay, so once Underwood's in the house, there's no threat to Underwood at that point, is there? Well, Your Honor, as appellants always maintain, bullets pierce windows. They pierce walls, depending on what they're made of. They pierce doors, depending on what they're made of. We put in evidence from police officers of shootings of individuals who have been shot inside their house from bullets fired from the outside of their house. So, appellant contends that even if he's seconds inside of his house, the threat hasn't dissipated. You're not arguing that the officer himself was under threat? No. The officer testified at all times that he did not perceive a threat to himself or the other officer on the scene. So the question is solely whether there's an imminent threat to Underwood. Yes, from the perspective of Officer Hutchins. Now, Officer Hutchins also testified that once he saw Darrell Underwood turn and, I'm going to say, briskly go towards his house, he focused squarely on Roy Richards Jr. pursuing him with a firearm. So he never saw Darrell Underwood enter his house. So he never what, Counsel? He never saw Darrell Underwood enter his house. Well, that's what he says, but do we have to accept that on this record? Well, Your Honor, it's an undisputed fact in this record. Since testimony, that's all we have on that, though, right? Yes, but you don't have any testimony to controvert it. In fact, I think the plaintiff conceded that he looked through a scope primarily at Roy Richards Jr. Well, I'm not sure anybody could controvert it, but you could dispute it in the sense of the burden of you can't just assume that it's true because he says so. I'm not saying that it's not true. But in our present procedural posture, I think that might not be an appropriate statement as an accepted fact. Your Honor, I understand that, but I also, the record bore out that another witness to the east of that house could not see whether or not Mr. Underwood entered the house. When he was initially questioned, he assumed that he was on the porch. But as the questioning bore out in discovery phase, what was found out was that that view was blocked off. Thank you. You're welcome. Well, didn't, you know, this witness, Mr. James, across the street, I'm looking at his deposition, and he said that Roy, he talks about Underwood going into the house. He slams the door, and then he says, Roy, back down the steps, a couple of steps, and then turn west towards his car until he was maybe about 10 o'clock. And he also said that his rifle was pointed skyward. Now, how do you recover from that testimony if we accept that as being the evidence here that's most favorable to the plaintiff? Your Honor, I think you Doesn't that create a problem with an officer firing shots at a person who is retreating, and the rifle is pointed skyward? Your Honor, I think you have to look at the totality of the circumstances and everything that he knew at the moment he effected the seizure. You have to look at this from his perspective. What he saw, what he knew was the individual was intoxicated, causing a disturbance. He saw him fighting, and he went and saw him retrieve a rifle and then pursue the individual he was fighting with. I think he can rely on his knowledge, skills, and experience and make the rightful assumption that this person is a threat at this moment, regardless of how the rifle is in his head. He's just finished fighting the individual and went and got a weapon. But isn't it crucial that the evidence shows, and the court accepted it, that he turned around away from the Underwood house and seemed to be going back to his own car? At the moment he was shot. This is a rapidly moving, tense, uncertain situation, and he's perceived a threat from the moment he emerged from the rear of the vehicle. Let's look at it from a different angle. I think you've acknowledged that about 12 seconds may have elapsed from the time you went and got the gun from the car until the shooting. I believe 12 seconds. I'm sorry. Isn't that sufficient time to at least issue a warning? Your Honor, I think it's 12 seconds from the minute the fight broke up for him retrieving the weapon until the moment of the seizure. Your Honor, as it relates to the warning, I think when he sees him emerge from the rear of that vehicle and he has probable cause to believe that he's a threat, I think that a warning for him in his position was not practical because a warning, the time it takes to give Roy Richards a warning, could be the time that he shoots Darrell Underwood. And from his perception, he had to make a staff judgment. He had to make a call, and he didn't see it as practical. Is there any evidence of the time elapsed from the moment he retrieved the weapon to the moment he was shot? There is no evidence in the record. I would say only the 21, 22 seconds in the court's finding that they fought for at least 10 seconds after Michael Stotts told them that the police were there. Because we haven't gotten to the other issues, I would like to reserve the remainder of my time for rebuttal. Thank you. Good morning. May it please the court, counsel? Well, I think your honors are honing in rather astutely on the salient points of this matter. The Fourth Amendment issue created in this case is as follows. Was it reasonably, was it objectively reasonable for Dennis Hutchins to use deadly force on Roy Richards without any kind of an announcement, without any kind of a warning, in order to protect Mr. Underwood from imminent death or great bodily harm, where Mr. Underwood was not in the vicinity of Mr. Richards, was not about to be shot by Mr. Richards, and was in fact inside of his home at the time that Mr. Hutchins used deadly force? From the instant or the moment that the summary judgment was filed in this case, my friend in the city and Mr. Hutchins have used this phrase, the facts foreclose the factual dispute. I don't know what that means. I just don't. And I say that with all candor and respect. And I'd like to correct my friend, Mr. Benton, when he said that this all boils down to the perspective of Mr. Hutchins. That's not true. What we are looking at here is the scene from the perspective of an objectively reasonable officer, not a subjective officer, because if we looked to the subjective officer, well, that officer might be unscrupulous, and that officer might say all kinds of things that he or she perceived that they didn't, in order to cover themselves and to protect themselves from liability. As Judge Moody implemented down below in the district court, we're at the summary judgment stage here, and the courts must view the facts in the light most favorable to the non-moving party. It must take as true those facts asserted by the non-moving party that are properly supported by the record. We retain two experts in this case also, to drive the point home. A police practices expert and a biomechanical engineer. We went into Mr. James' home. We videotaped what he saw, the panoramic view that unfolded before him. If you take the facts in the light most favorable to the non-moving plaintiff, our expert says that you have a per se constitutional violation, and it's because of, Judge, what you said earlier. Once Mr. Underwood makes it into his home, if there ever was an imminent threat, a threat of imminent death or serious bodily harm, it dissipates at that moment. Mr. Underwood was inside his home and seated, talking with his roommate when he heard gunshots outside. In fact, he testified that he thought that Roy had shot the gun, which turned out to be a BB gun, but that's of no moment. It looked like a real gun. But he thought that it was his nephew that was shooting, not the police. So Mr. Underwood was nowhere near the scene when he was ostensibly being protected by the self-serving testimony given by Dennis Hutchins. So the facts here in the light most favorable to the plaintiff are as follows. These two officers get a call that there is an intoxicated man with a long gun. And, again, they're to presume that that gun is capable of taking life. Of course, any reasonable officer would do that. But from moment one, you get the impression that they wanted to sneak up on this scene and use – you get the impression that Dennis Hutchins, a marksman, a former Marine, really wanted to use his assault rifle. So he deployed it. He didn't tell anybody he was going to deploy it. He parked around the corner from the incident. Even though he knows that police presence is a deterrent, police presence is a level of force, police presence diffuses a lot of these incidents. And he parks his car around the corner and decides to approach very silently, very clandestinely in the dark October evening, early morning, under a canopy of oak trees, crouched down, never revealing his presence, nor did his partner. One 1,000, two 1,000, three 1,000, four 1,000. We can go all the way up to 22. He testified that it only takes about a second, Officer Hutchins said, to give a warning. He could have given 22 warnings in that time. He could have said, hey, we're the cops, break it up. He could have said anything. He could have flashed his lights, nothing. Instead, he crept toward the scene, stopping 80 feet away, armed with his incredibly powerful, high-tech scoped assault rifle. He stopped and he raised his gun without saying a word, watching the scene unfold before him. And I don't mean to point the phony gun at anyone, but that was the time when a reasonable officer says, we've got basically a barroom fight here, a bar time skirmish. Nobody has a gun on them. Hutchins testified that when he came upon the scene and stopped, their arms were on each other. There was nothing in their arms, nothing in their hands. And rather than do the reasonable thing, rather than do the prudent thing, rather than do the lawful and constitutional thing, he posted up with his gun and he lined up a headshot. And he shot Roy Richards right in the center of his head from 80 feet away using a scope. You can't do that with somebody who's running around. You can't place that shot like that. So what we have here is a fight between an uncle and a nephew, an intoxicated nephew, who should have known better but didn't deserve to die. What if the evidence, rather than Richards was turning away from Underwood's house, what if the evidence was that he was lowering the rifle at the house at the time he was shot? We still prevail on summary judgment. We still prevail and get to a jury. Because it's not just the fact that the rifle was pointed skyward, which it was, and that is rebutted and uncontroverted, but Mr. Underwood was inside of his home at the time. Roy could have been pointing that gun at the front door. It still deserves a warning. It still deserves at the very least a warning. And if you know what, if Mr. Richards doesn't respond to that warning or if he turns his gun in some ominous direction, well then I think probably on those facts, even though the distance and the kind of the clandestine thing is still a little debatable, but then a deadly force becomes a more reasonable option. But, again, what you have here is this was almost like a hunt. They sneak up. They're in the neighbor's yard. They're in the bushes underneath the canopy of trees. They don't ever say who they are, what they're doing. They don't say stop. They just let it all unfold. And so it's funny, too, when Mr. Benton says that it's undisputed that Derek Underwood made it inside his house. Well, it only became undisputed after we pinned that down through depositions and through our experts. If you look at the answer to the complaint, Dennis Hutchins vigorously and vociferously denies that Mr. Underwood was inside of his house. That's what he told investigators. He said, no, he was outside. The guy had a gun at his back. He was conjuring images of Bugs Bunny being chased by Elmer Fudd with the barrel of the rifle mere inches from the man's back. That's the impression that was given by Mr. Hutchins through two lines of questioning and through the beginning of my deposition. But the physical evidence refuted that. The physical evidence refutes that as well as the eyewitness testimony. What was the officer's – well, Officer Hutchins was not the only officer that was armed with a rifle. Correct. So what was their testimony as to why they approached the incident in this way instead of using the other methods of approach, which you have mentioned of the lights, shouting, going immediately to the scene? Sure. Judge Shepard, this was a very interesting delve into police psychology, I would say. You have to consider that Dennis Hutchins is a decorated Marine veteran. He's a marksman. He's on the SWAT team. He's a real gung-ho, kind of a tough, leatherneck type of a guy. And he's to be commended for all the good stuff that he's done in his career and in the service. His partner is a gentleman by the name of Justin Tyre, who is a new officer and quite a timid one. And you got the impression very quickly in speaking with him during deposition, I did, that he was extremely deferential to his partner, Mr. Hutchins. So while they both deployed their assault rifles and they both failed to disclose that to dispatch, the impression you get is that Tyre was a tag-along. And so he just kind of went and followed Dennis Hutchins. And, you know, this is another point that I think is interesting for the court. If we're looking at an objectively reasonable officer's perspective, the question is begged. Why didn't they both shoot? Or why didn't they both not shoot? They were in the same place, shoulder to shoulder, watching the same stuff. What accounts for the diversion or for the difference in response? To answer your question, Judge, Tyre did the hear no evil, see no evil, speak no evil. He says that his gun malfunctioned and he couldn't get it to work. He would have shot if he could, but it was malfunctioning. This is a common defense given if you look at cases when one officer shoots and the other doesn't. They'll often say, well, there was an obstruction, someone moved in front of me at the last minute, or I couldn't get my gun to work at the last minute. They have to give some reason for their not shooting when their partner has, if they're going to be loyal to their partner. So what Officer Tyre says is that he wasn't looking at anything when Hutchins shot because he was experiencing a malfunctioning weapon and trying to get to the bottom of that. So he basically takes himself out of the scene so that he doesn't have to testify against his friend, which is a whole other disturbing aspect of this case, but that's the story nonetheless. I think just from your questions, I can tell your honors are familiar with the facts of this case. And I don't need to take any more time than I really... Well, I have one other question. Of course. Let's assume we skip past the constitutional violation and get to the clearly established prong. Do you have case or cases out there that are sufficiently similar factually to show that this right was clearly established? I would direct the Court to, first and foremost, Garner. We're looking at a fleeing felon here, and this isn't even a felon. Hutchins said basically that if Roy Richards had never gotten the gun, if when he went back to his car, instead of getting the gun, he had just gotten in his car and driven away, Hutchins says that was okay with him because he needed a cooling off period. Well, certainly if he was a felon, a dangerous felon, I can't imagine an officer would let him leave the scene and get in his car, but that's what Hutchins said. So Garner is squarely on point. I would say the case of Craighead v. Lee. Just having a gun on your person doesn't mean that officers can take pot shots at you, or it doesn't mean that you're open target, especially in an open carry state like Arkansas. So Craighead v. Lee is an interesting case because in that case, officers came upon a scene. They knew that there was some aggressor and some victim, and when they got on the scene, there was a taller man holding a gun out of the reach of the smaller man. The smaller man was the aggressor. The taller man happened to be the victim. The officer shot the taller man. He said, well, the guy had a gun. Well, the court said, no, it's not that easy. This court said, no, it's not that easy. The gun was in the air, skyward. You've got to give a warning. You have to do more. You don't just get to take a shot. You don't get a green light when you see a gun. So Craighead. I would also say the Casella case because the officer in Casella, who is vindicated for his actions, did everything that Dennis Hutchins did not do. He warned. He made his presence known. He also was not fearful of his life, but for a third party. Speaking of warning, does the record reflect the amount of time from when Richards retrieved the weapon until he was shot? The best I can get you on that, Judge, is this. We have testimony that Darrell Underwood was inside of his house for five seconds before gunshots were fired. So if you combine that with the fact that Darrell says that he saw Roy getting the gun as he was about to go up the stairs and enter his apartment, a distance of, I'd say, about 12 feet, we can, I think, pretty confidently say that there was at least seven, eight seconds to just say, hey, what are you doing? Buddy, put it down. You're a dead man if you don't put it down. Anything like that. And I suspect that Roy, knowing his family the way I do, knowing his uncle the way that I do, I suspect Roy would have said, holy mackerel, and would have dropped that gun in a heartbeat. And then he would still have himself a heartbeat. So this is a very tragic case, one where the facts in our favor, and even if they're not, there's so many conflicting facts. There's a couple of conflicting facts in some of these points. It certainly is fitting for a jury trial. I can't imagine a case better suited. I thank you all for your time this morning. If there's no more questions. Very well. Thank you, Mr. Lloyd. Thank you very much. Judge Shepard, I would like to address your question about a case that shows, that's on point in terms of clearly established law prone. The Casella case noted White v. Pauley when it said that you can't establish a violation of clearly established law at a high level of generality. You can't say, Gardner says, you should know that you can only use deadly force if you see immediate death or a grievous bodily injury about to occur, and then remand the case back down. So you can only do that if it's an obvious case, essentially. So I refer you to Casella for that point. This is not an obvious case. I mean, if you take totality of the circumstances, everything the officer knew before he arrived, and what he saw when he was 80 feet away. As far as Craighead v. Lee, Judge Shepard, I would refer you to my reply brief. I distinguished Craighead from this instance in that brief. And like I said, as far as Gardner goes, that's a high level of generality. We both cite Casella in support of our position. Casella was the only shooter in his case. While he says Casella gave a warning, the dissent in Casella noted that he didn't give a warning. I cited for the proposition that he perceived the threat. He was defending the life of another individual. And the Supreme Court found that he didn't violate clearly established law. The contours weren't specific. I want to respond to a few things my friend Mr. Lowe said. There are no facts in the record that Dennis Hutchins posted up and looked through a scope and waited for a kill shot. I think if you listen to his MVR, you'll notice that he's moving up until shortly before he shoots. You can hear it. And to that point, the district court noted that Hutchins, and Mr. Lowe pointed out, Hutchins thought he was leaving when he returned to his car. And other observers thought he was leaving. So if he thought he was leaving, he's not posted up waiting for a kill shot. His shot was reactionary and he testified that he aimed for center mass and police officers are trained to shoot at center mass. The approach, Hutchins testified that they stopped, they got the news that he was armed with a long gun. And they approached in the manner that they did for officer safety reasons. He wanted to ascertain where that gun was before he engaged him. And he testified, his words not mine, I didn't want to kick off a shootout a block away. He knows there's witnesses outside, there's people outside. So that was his reason for approaching that way. One thing I also want to point out in favor of the objectable reasons, and Mr. Lowe is right. This is from the perspective of a reasonable police officer. And Officer Tire testified that he raised, looked through his scope, but his scope did not illuminate. I've pointed in my brief, I've pointed out on the record every place he said that. But he testified that he initially raised his gun to protect the life of Mr. Underwood. From his perception. But also, I think you should note the perception of the witnesses on the street. Charles Ray testified, I thought D was about to get shot. Lisa James was on the 911 call saying he's got a gun, he's got a gun. Michael Stott saw him emerge from the back of that car and turn and ran in his house for dear life. So if it's subjectively reasonable, or if it is just reasonable for all of these people to perceive Roy Richards as a threat. Why is it not for Officer Hutchins? I think you all, I agree with Mr. Lowe. You all have a good grasp of this case. The material facts, in about eight seconds. The material facts foreclose it in the sense that if you look at those seven facts I listed. You can underscore the objectable reasons of Officer Hutchins' action. Thank you, your honors. I appreciate your time. Thank you. Gentlemen, the court appreciates your appearance and arguments today. The case is submitted and we will decide it in due course.